NOT FOR PUBLICATION

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

DEBORAH PHILLIPS,              :
                              :    Civil Action No. 10-2445 (NLH)
            Petitioner,       :
                              :
      v.                      :    **OPINION**
                              :
WILLIAM HAUCK, et al.,        :
                              :
            Respondents.      :


**APPEARANCES:**

Petitioner pro se                Counsel for Respondents
Deborah Phillips                 Jennifer L. Bentzel
Edna Mahan Correctional Facility Ofc. of the Prosecutor
Clinton, NJ  08809               County of Burlington
                                 Mount Holly, NJ  08060


**HILLMAN**, District Judge

     Petitioner Deborah Phillips, a prisoner currently confined at Edna Mahan Correctional Facility in Clinton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Administrator William Hauck and the Attorney General of New Jersey.

     For the reasons stated herein, the Petition will be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Law Division, Burlington County, denying Petitioner's state petition for post-conviction relief.[1]

> At approximately 12:30 a.m. on April 14, 2000, Tesa Childs met defendant, Charlene Henley and Kimyada Albright at the Star Boat Club in Burlington City, New Jersey.  Upon arrival she was able to smell alcohol on the breath of all three women.  At some point, the ladies left the Star Boat Club and went to an "after-hours" club in Philadelphia.  The ladies traveled together in a silver Volvo driven by the defendant. During the ride to the "after-hours" club, Ms. Childs offered to drive because she had not consumed any alcohol that evening and in her opinion defendant was driving erratically.  Defendant refused Ms. Childs offer to drive, stating that she was fine to drive.

> The women stayed at the "after-hours" club in Philadelphia for only about fifteen minutes.  At this point in the evening Ms. Childs had only consumed one-half of a Molson Ice beer.  For this reason, as the quartet was walking to defendant's vehicle, Ms. Childs renewed her offer to drive and defendant, again refused stating that she was fine to drive.  Ms. Childs continued to plead with defendant, asking her to allow her to drive, Ms. Henley grabbed for the keys and told defendant to allow Ms. Childs to drive because they had all been drinking and Ms. Childs had not.  Defendant again refused these requests.

> At approximately 4:35 a.m., a single vehicle accident was reported at Route 130 and Branch Pike in

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Cinnaminson, New Jersey.  Patrolman Paul Seymour of the Cinnaminson Township Police Department was the first to arrive on scene.  He observed that a silver Volvo had struck a utility pole.  Patrolman Seymour observed that all the doors of the vehicle were closed, except for the driver's door, outside of which he observed an injured female leaning against the car in the open door-well.

Patrolman Seymour approached the woman; he found her to be dazed, he also observed a visible forehead injury and smelled a strong odor of alcohol on her breath.  Patrolman Seymour identified this woman in Court as the defendant.  The patrolman secured the defendant in a safe position and began helping the occupants he observed in the backseat of the car.  He first observed Ms. Henley, who was later determined to be the rear-seat passenger-side occupant of the vehicle.  Ms. Henley was actually lying on top of the front, passenger-side seat with her body facing the ceiling; the front-passenger seat had been pushed and bent forward against the dash of the vehicle.  He then observed Ms. Childs whose entire body was on the floor behind the driver's seat, except for her feet, which were resting upon the seat.

At this point, additional officers began arriving on scene.  Patrolman Seymour instructed Patrolman Siemietkoski to continue to care for Ms. Childs, while he communicated with dispatch to update the status and request ambulances for the injured women.  As he was doing this, he observed a fourth victim, Ms. Albright, who had not previously been visible because she has been covered by the rear seat passenger on top of the seat, the seat itself and the dashboard of the vehicle.

Defendant and the driver's side, rear seat passenger, Ms. Childs, were transported to Cooper University Medical Center in Camden, New Jersey.  The other two women in the car, Ms. Henley and Ms. Albright, died as a result of the injuries sustained in the crash.  En route to the hospital Gary Ackerman, the emergency medical technician, asked defendant if she had been drinking, so that he could determine the medically appropriate treatment; defendant responded that she had drunk a few beers.  Mr. Ackerman also noticed the strong odor of alcohol permeating throughout the ambulance.

3

Upon direction of Sergeant Johnson, Patrolman Seymour left the scene of the accident and went to Cooper Hospital Trauma Center to secure a blood sample from the defendant.  Subsequent testing of this sample determined that defendant's blood alcohol content was .211. [Fn1]  Thomas Brettell, director of forensic science with the New Jersey State Police, testified that this level of blood alcohol content was the equivalent of 9.6, twelve-ounce beers.  He further testified that this amount of alcohol would severely impair the vision, reaction time, depth perception, and alertness of an individual.  It would also cause a person to experience fatigue, drowsiness and increased willingness to take risks.  The combination of these effects would severely impair a person's ability to operate a motor vehicle.

[Fn1] Several readings were actually taken, .211 represents the lowest BAC reading.

Detective Sergeant David Benn, of the Burlington County Prosecutor's Office, Collision Analysis and Reconstruction Unit, reviewed the entire file in an effort to determine what happened in the crash, including vehicle speed, movement of the passengers, and other potential effects of the accident.  Using an occupant kinetic study, based on physical evidence and information contained in the case file, Sergeant Benn concluded within a reasonable degree of scientific certainty, that defendant was driving the vehicle at the time of the silver Volvo's impact with the utility pole.  He was also able to determine within a reasonable degree of scientific certainty the location of the other women at the time of impact:  Tesa Childs would have been seated in the driver's side, rear seat; Kimyada Albright was in the passenger-side, front seat; and Charlene Henley was the passenger-side, rear seat occupant.  He was able to determine that defendant was the driver of the vehicle.  Importantly, he was able to determine that in this particular accident based on the principal direction of force, lack of rotation and particular vehicle involved, it would have been contrary to the laws of physics for a front-seat passenger to be thrown over the seats and end up in the rear seat.

The silver Volvo was transported back to the Cinnaminson Township Public Works Garage.  The car was

further processed for evidence.  Patrolman William
Johnson recovered two hair samples from the front
windshield of the vehicle, directly in front of the
driver's seat.  After some preliminary testing at the
New Jersey State Police Forensic Laboratory, these hair
samples were sent, along with two buccal swabs taken
from the left and right side of the defendant's mouth,
to Orchid Cellmark Laboratory Forensics for DNA
analysis.

A mitochondrial DNA analysis was performed by Mr.
Bryan Sloan, from Orchid Cellmark Forensics Laboratory
in Dallas, Texas, on these samples.  This analysis
revealed that the defendant could not be excluded as a
contributor to the hair in the windshield.
Furthermore, the buccal swab and hair sample did not
match any of the 4,502 mitochondrial DNA profiles
maintained in an FBI database.  Finally, although
mitochondrial DNA is shared by maternally related
individuals, this is of no moment here, because no one
in the car that evening was maternally related to
defendant.

(Letter Opinion, Superior Court, Law Division, Burlington County,

at 2-7 (February 25, 2008) (record citations omitted).)

In its Opinion on direct appeal, affirming Petitioner's

conviction and sentence, the Superior Court of New Jersey,

Appellate Division noted the following additional facts relevant

to this Petition:

We need not recount all of the facts presented by
the State at trial.  Suffice it to say that on April
14, 2000, defendant drove her vehicle while intoxicated
and collided with a utility pole on Route 130 in
Cinnaminson.  In defendant's vehicle were two women,
who died as a result of the accident and a third woman,
who was injured.  Defendant was also injured and
hospitalized because of the accident.  During the
police investigation, defendant gave a statement to the
police.  The statement was taken at defendant's home
following her release from the hospital.

(Opinion, Superior Court of New Jersey, Appellate Division, at 2 (Feb. 8, 2005).)

B.  Procedural History

Following a jury trial in the Superior Court of New Jersey, Law Division, Burlington County, Petitioner was convicted of two counts of second-degree vehicular homicide, N.J.S.A. 2C:11-5a, and one count of third-degree assault by auto, N.J.S.A. 2C:12-1c(2).  The trial court sentenced her, on the vehicular homicide counts, to two consecutive ten-year terms subject to the No Early Release Act, and, on the assault count, to a consecutive eighteen-month sentence.  Plaintiff appealed.  On February 8, 2005, the Superior Court of New Jersey affirmed and, on May 3, 2005, the Supreme Court of New Jersey denied certification. State v. Phillips, 183 N.J. 585 (2005).

On September 6, 2005, Petitioner filed in state court a petition for post-conviction relief.  Following a non-evidentiary hearing on February 8, 2008, the trial court denied the petition in an opinion and order dated February 25, 2008.  The Appellate Division affirmed the denial of relief on October 7, 2009, and the Supreme Court of New Jersey denied certification on February 11, 2010.  State v. Phillips, 201 N.J. 273 (2010).

On February 16, 2010, Petitioner filed in state court a motion for reconsideration of sentence, which the trial court

6

denied on March 10, 2010. Petitioner did not appeal this decision.

This Petition, dated April 28, 2010, followed. Here, Petitioner asserts the following claims: (1) the trial court erred in not suppressing her statement to police, because she did not give a knowing and valid waiver of her Fifth Amendment right to remain silent; (2) Petitioner's trial counsel provided constitutionally ineffective assistance by (a) failing to communicate plea offers accurately and failing to explain the benefits of accepting the plea offers, (b) failing to retain an accident reconstruction expert and a forensic scientific expert, and (c) failing to present medical proofs that Petitioner was so incapacitated that she could not have left the vehicle and that she did not have a facial laceration as the police officer at the scene testified; and (3) judicial factfinding in connection with the sentencing violated her Sixth Amendment right to trial by jury. Respondents have answered as to the merits of these claims. Petitioner did not reply.

This matter is now ready for decision.

## II. <u>28 U.S.C. § 2254</u>

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an

7

> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of
> the United States.

With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the

adjudication of the claim

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly
> established Federal law, as determinated by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court

precedent "if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless

arrives at a result different from [the Court's] precedent."

Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,

for the Court, Part II).  A state court decision "involve[s] an

unreasonable application" of federal law "if the state court

identifies the correct governing legal rule from [the Supreme]

Court's cases but unreasonably applies it to the facts of the

particular state prisoner's case," and may involve an

"unreasonable application" of federal law "if the state court

either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  <u>Id.</u> at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.
<u>Id.</u> at 409.  In determining whether the state court's application
of Supreme Court precedent was objectively unreasonable, a habeas
court may consider the decisions of inferior federal courts.
<u>Matteo v. Superintendent</u>, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits
of a claim is entitled to § 2254(d) deference.  <u>Chadwick v.
Janecka</u>, 302 F.3d 107, 116 (3d Cir. 2002) (<u>citing</u> <u>Weeks v.
Angelone</u>, 528 U.S. 225, 237 (2000)).  With respect to claims
presented to, but unadjudicated by, the state courts, however, a
federal court may exercise pre-AEDPA independent judgment.  <u>See
Hameen v. State of Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000),
<u>cert. denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL
1523144, *6 n.4 (D.N.J. 2000).  <u>See also</u> <u>Schoenberger v. Russell</u>,
290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and
cases discussed therein).  In such instances, "the federal habeas
court must conduct a de novo review over pure legal questions and
mixed questions of law and fact, as a court would have done prior

to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)). "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." Simmons v. Beard, 581 F.3d q158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting

10

submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

III.   ANALYSIS

A.   The Suppression Claim

Petitioner asserts that the trial court should have suppressed the taped statement she gave to police on June 6, 2000, the day after her release from the hospital, because she did not give a knowing and valid waiver of her right to remain silent.  The Appellate Division rejected this claim on direct appeal.

> We conclude that the judge did not err in admitting defendant's statement into evidence.  Here, defendant gave her statement at home, following her release from the hospital.  The judge's finding that the statement was not given during custodial interrogation is amply supported by the record.  State v. Locurto, 157 N.J. 463, 470-71 (1999).  "It is custodial interrogation and not the mere focus upon a particular subject which implicates the requirement that Miranda warnings be given."  State v. Choinacki, 324 N.J. Super. 19, 43 (App. Div.) (citations omitted), certif. denied, 162 N.J. 197 (1999).  Moreover, even if the judge erred in admitting the statement, the error was harmless beyond a reasonable doubt, State v. Macon, 57 N.J. 325, 335 -36 (1971), in light of the other overwhelming evidence of defendant's driving the vehicle at the time of the fatal crash.

(Opinion, Appellate Division, at 4-5 (Feb. 8, 2005).)

Pursuant to the Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, "No person ... shall be compelled in any criminal case to be a witness against himself ... ."  In Miranda v. Arizona, the Supreme Court of the United States held that:

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. at 478-79 (footnote omitted).

A waiver may be made orally or may be implied from a suspect's conduct.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Cruz , 910 F.2d 1072, 1080 (3d Cir. 1990), cert. denied, 498 U.S. 1039 (1991).  To introduce into evidence a suspect's statement made during custodial interrogation, the government must establish, by a preponderance

of the evidence, a voluntary waiver of <u>Miranda</u> rights.  <u>Colorado</u>
<u>v. Connelly</u>, 479 U.S. 157, 168-69 (1986).  This is a rule of
constitutional dimension, violation of which may justify issuance
of a writ of habeas corpus.  <u>See generally</u> <u>Dickerson v. United</u>
<u>States</u>, 530 U.S. 428 (2000).

> Once warnings have been given, the subsequent
> procedure is clear.  If the individual indicates in any
> manner, at any time prior to or during questioning,
> that he wishes to remain silent, the interrogation must
> cease.  At this point he has shown that he intends to
> exercise his Fifth Amendment privilege; any statement
> taken after the person invokes his privilege cannot be
> other than the product of compulsion, subtle or
> otherwise.  Without the right to cut off questioning,
> the setting of in-custody interrogation operates on the
> individual to overcome free choice in producing a
> statement after the privilege has been once invoked.

<u>Miranda</u>, 384 U.S. at 473-74.  A defendant's right to cut off
questioning must be "scrupulously honored."  <u>Michigan v. Mosley</u>,
423 U.S. 96, 103-04 (1975).

"The requirement that <u>Miranda</u> warnings be given does not, of
course, dispense with the voluntariness inquiry.  But ...
'[c]ases in which a defendant can make a colorable argument that
a self-incriminating statement was 'compelled' despite the fact
that the law enforcement authorities adhered to the dictates of
<u>Miranda</u> are rare.'"  <u>Dickerson</u>, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question
requiring independent federal determination," and is thus not
subject to the § 2254(d) presumption of correctness.  <u>Miller v.</u>
<u>Fenton</u>, 474 U.S. 104, 109-110 (1985).

13

The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." Arizona v. Fulminante, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Dickerson v. United States , 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These surrounding circumstances include "not only the crucial element of police coercion, Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (some internal citations omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  "[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable."  Dickerson, 474 U.S. at 117.

Here, the Appellate Division correctly identified the applicable Supreme Court case law.  The state courts' findings that Petitioner was not subjected to custodial interrogation, and that Miranda warnings were, therefore, not required is, as the

14

Appellate Division held, amply supported by the record. Petitioner was in her own home, she invited the officers in to question her about the accident, she agreed to be audiotaped. There is nothing in the record to suggest that Petitioner objected to the questioning or that she considered herself to be in custody.  To the contrary, the very core of her argument here is that the officers did nothing to make her aware that they considered her a suspect.  Thus, she admits that she did not feel any coercion at the time she made her statement; to the contrary, the statement was clearly voluntary.  Petitioner is not entitled to relief on this claim.

B.   The Ineffective Assistance of Counsel Claim

Petitioner claims that her trial counsel failed to provide constitutionally effective assistance by (a) failing to communicate plea offers accurately and failing to explain the benefits of accepting the plea offers, (b) failing to retain an accident reconstruction expert and failing to retain a forensic DNA expert, and (c) failing to present medical proofs that Petitioner was so incapacitated that she could not have left the vehicle and that she did not have a facial laceration as the police officer at the scene testified.

These were among a multitude of claimed defects in representation that Petitioner raised in her state petition for post-conviction relief.  The state courts rejected them all:

15

In evaluating an ineffective assistance claim New Jersey follows the federal rule.  State v. Fritz, 105 N.J. 42 (1987), (adopting the two prong test articulated by the United States Supreme Court in Strickand).  The Strickland rule for evaluating ineffective assistance of counsel is as follows:

> First, Defendant must show that counsel's performance was deficient.  The requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed Defendant by the Sixth Amendment.  Second, Defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive Defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.
>
> [Strickland, supra, 466 U.S. at 697.  See also, State v. Marshall, 148 N.J. 89, 156 (1997); State v. Fritz, supra, 105 N.J. at 52.]

Defendant's ineffective assistance of counsel claims will now be discussed under the rubric announced in Strickland/Fritz.

**a.   Trial Counsel was not Ineffective Due to his Failure to Engage an Expert Witness in the Field of Accident Reconstruction.**

Defendant argues that her trial counsel was ineffective because he failed to obtain an expert in the field of accident reconstruction.  An expert of this type would rebut the State's expert who had stated that defendant was driving the vehicle at the time of the accident.  As stated above, in order to prevail on this claim, defendant must demonstrate that counsel was, in fact, ineffective and that she was prejudiced by this deficient performance.  Strickland, supra, 466 U.S. at 687.  Defendant is unable to meet either prong of Strickland with regard to this first claim.

16

Defendant is unable to meet the first prong of Strickland because trial counsel did consult with an expert in accident reconstruction.  The certification from defendant's trial counsel, Mr. Timothy Reilly, Esquire, makes clear that he did speak with Dennis Andrews, an accident reconstruction expert. [Certification of Timothy Reilly, Pa5].  Mr. Andrews told counsel that he could not provide **any** testimony that would be helpful to defendant's case.  Ibid. After this discussion with Mr. Andrews, Mr. Reilly made the strategic decision not to present an expert in accident reconstruction and attack other areas of the State's case, specifically, counsel states:

> Thus, while an accident reconstruction expert was consulted on Ms. Phillips' behalf, the expert would not have provided any support to her defense, and presenting Mr. Andrews may in fact have been detrimental to her case. Based on the aforementioned, I made the strategic decision not to present an accident reconstruction expert, and to attack other areas of the State's case in order to provide the best defense possible for Ms. Phillips.

[Certification of Timothy Reilly, Pa6].

It is well-settled that counsel is entitled to make a wide-range of strategic decisions in order to present his client's case, and such decisions are afforded a great deal of deference.  "Strategic choices made after thorough investigation of law and facts are relevant to plausible options are virtually unchallengeable."  Strickland, supra, 466 U.S. at 690.

Clearly, here, counsel's strategic decision to attack other areas of the State's case was a reasonable decision since Mr. Andrews informed counsel that he was unable to provide **any** testimony that would be helpful to defendant's case.

Additionally, in light of counsel's discussion with Mr. Andrews, defendant is unable to meet the prejudice prong of the Strickland analysis.  If an accident reconstruction expert was unable to provide **any** testimony that would have been beneficial to defendant's case, defendant was not prejudiced by counsel's failure to engage an expert in that field.

17

**b.    Trial Counsel was Not Ineffective Due to his Failure to Accurately Communicate All Plea Offers Received from the State of New Jersey.**

Defendant next argues that trial counsel's alleged failure to communicate all plea offers amounted to ineffective assistance of counsel.  It is well-settled that counsel must communicate all plea offers made by the State to his client.  Flores v. State, 784 S.W.2d. 579, 581 (1990).  Despite this, defendant still must prove both the ineffective prong and the prejudice prong of the Strickland analysis to prevail on an ineffective assistance claim based on counsel's failure to communicate plea offers.  State v. Murray, 345 N.J. Super. 158, 174, certif. denied, 172 N.J. 179 (2001).

In a certification received from trial counsel, paragraph eleven states:

> Any plea offers extended to Ms. Phillips by the Burlington County Prosecutor's Office were relayed to her at the earliest possible time.  In light of the fact that defendant was arrested for driving while intoxicated just prior to the commencement of trial, I most certainly stressed the benefit of accepting a plea bargain.  At all times, Ms. Phillips was adamant that she would not accept a plea bargain under any circumstances.

> [Certification of Timothy Reilly, received by the Court on January 28, 2008, paragraph 11.]

Defendant was also advised by this Court at her pre-trial conference of the proposed plea agreement at the time of plea cut-off.  Defendant also signed the pre-trial memorandum in this case, which contained a plea offer from the State.  Additionally, defendant's potential exposure was explained and it was explained that the No Early Release Act would apply, if convicted on Count 1 and/or 2.  At no point did defendant ever express an interest in accepting a plea offer.

Based on the fact that defendant was "adamant" that she would not accept a plea offer under any circumstances and the fact that defendant did not express any interest in accepting a plea offer at the

pre-trial conference, even in the unlikely event that
defendant was able to prove actual ineffective
assistance of counsel based on an alleged failure of
counsel to communicate all plea offers made by the
State, defendant is unable to demonstrate any prejudice
because it apepars she would not have accepted any plea
offer.  Therefore, defendant is not entitled to post-
conviction relief for counsel's alleged failure to
communicate plea offers because she fails to meet the
second prong of the <u>Strickland</u> analysis.

**c.   Trial Counsel Failure to Have the "Hair
       Sample" Analyzed or Compared to the Other
       Three Occupants of the Vehicle Did Not Amount
       to Ineffective Assistance of Counsel.**

Defendant's next allegation states that trial
counsel was ineffective because he failed to have the
hair samples collected from the windshield directly in
front of the driver's seat analyzed or compared to the
other occupants of the silver Volvo.  Defendant argues
that had counsel done this, the evidence gathered would
have been helpful to her defense that she was not
driving the vehicle at the time of the accident.
Defendant is unable to meet the first prong of the
<u>Strickland</u> analysis.

"Counsel has a duty to make reasonable
investigations or to make reasonable decisions that
makes particular investigations unnecessary."
<u>Strickland</u>, <u>supra</u>, 466 U.S. at 691.  Whether counsel
has fulfilled this duty is measured by the
"reasonableness in all circumstances, applying a heavy
measure of deference to counsel's judgments."  <u>Ibid</u>.
As stated above, strategic decisions made by counsel
after thorough investigations are "virtually
unchallengeable."  <u>Ibid</u>. at 690.

Again based on the certification of defendant's
trial counsel, it is clear that counsel was not
ineffective in his decision not to have the hair
samples compared to the other passengers or analyzed by
a defense expert in DNA analysis.  In his
certification, Mr. Reilly relates the extensive
investigation he conducted with regard to the hair
samples collected from the vehicle.  [Certification of
Timothy Reilly, Esquire, Pa9].

Mr. Reilly did explore the possibility of having Dr. Richard Saferstein, Ph.D., conduct mitochondrial DNA analysis on the hair. [Certification of Timothy Reilly, Esquire, Pa9]. Dr. Saferstein opined that the State's expert had properly analyzed the DNA evidence. [Certification of Timothy Reilly, Esquire, Pa9]. He further advised that mitochondrial DNA is shared only by people related through maternal lineage and that he other women in the car could only have provided the DNA evidence, if they were related to defendant. [Certification of Timothy Reilly, Esquire, Pa9]. After this investigation, trial counsel made the strategic decision that there was no benefit in calling Dr. Saferstein.

Additionally, Defendant suggests that Mr. Reilly was ineffective for failing to call a witness that could testify that defendant was wearing synthetic hair extensions on the night of the accident. Because the hair taken from the windshield was human hair, this fact would suggest that the hair found in the windshield directly in front of the driver's seat was left by one of the other women in the car supporting defendant's contention that she was not driving the car. [Certification of Timothy Reilly, Esquire, Pa9[. Mr. Reilly states that he did interview the witness provided by defendant, who would testify that she was wearing synthetic hair extensions at the time of the accident. [Certification of Timothy Reilly, Esquire, Pa9[. However, this witness advised that the hair extensions were synthetic hair that was "weaved" in with defendant's real hair. [Certification of Timothy Reilly, Esquire, Pa9[. Therefore, this witness would have been of no help in establishing that defendant was not driving the vehicle. [Certification of Timothy Reilly, Esquire, Pa9].

Based on the case law, the decision not to call these witnesses was a thoroughly investigated, strategic decision of counsel. In his certification counsel states:

Therefore, based on my conversations with Dr. Saferstein and Ms. Phillips, I did not feel there was any benefit to calling either [Dr. Saferstein] or the witnesses who could testify to the hair extension issue. Also, based on my conversation with Dr. Saferstein,

20

I also did not feel that there was any reason
to have any additional DNA evidence testing
conducted.

[Certification of Timothy Reilly, Esquire,
Pa9].

Such decisions are presumed appropriate and
virtually unchallengeable. <u>Strickland</u>, <u>supra</u>, 466 U.S.
at 690.

...

**g.   Trial Counsel Failure to Procure Medical
Proofs of Defendants Incapacitation and Lack
of Facial Laceration was a Reasonable Trial
Strategy.**

Defendant's next allegation of ineffective
assistance of counsel on the part of trial counsel
alleges that Mr. Reilly should have procured medical
proofs to show that she was so incapacitated she could
not have left the motor vehicle.   Additionally, she
argues that Mr. Reilly should have presented evidence
that she did not have a facial laceration, and
therefore, it was unlikely that her head had come into
contact with the windshield suggesting that someone
else had been driving the vehicle at the time of the
impact.   Defendant is unable to meet the first prong of
<u>Strickland</u> with regard to either of these claims as
they are contrary to the proofs adduced at trial. [Fn2]

[Fn2] Defendant's own recitation of the facts
acknowledges that defendant was the only
woman identified by Patrolman Seymour outside
the vehicle and that she was observed with a
visible laceration on her forehead.   [Db
p.3].

Based on the undisputed testimony of Patrolman
Seymour, had counsel attempted to present evidence to
show defendant was too incapacitated to have left the
motor vehicle, it would have been devastating to
defendant's case.   Patrolman Seymour testified that
when he arrived, defendant was outside the vehicle
leaning against the door well of the driver's side of
the vehicle.   [2T44-12 to 44-18].   He was further able
to identify the woman he observed that evening sitting

in that position as the defendant, in Court. [2T47-24 to 48-8]. The patrolman's testimony was undisputed. Therefore, presenting this evidence would simply bolster the State's case as to the intoxication level of the defendant and inflame the jury, while gaining no tactical advantage for the defendant. Clearly, the decision not to present such evidence was a well-arrived strategic decision of counsel.

Defendant also alleges that counsel was ineffective for [not] producing medical proofs that she did not have a laceration on her face, suggesting that it was unli8kely that her head had made contact with the windshield of the Volvo. This assertion is belied by the record as well. Again, Patrolman Seymour testified that he observed a "visual injury on her forehead which appeared to be from her ehad hitting the windshield. [2T47-21 to 47-23]. Additionally, the Emergency Medical Technician, Gary Ackerman, testified that he believed that defendant may have had a head injury. [2T144-16 to 144-17]. Further, upon speaking with the witnesses that defendant suggested could testify to the fact she had no cuts on her face, they told counsel they did, in fact, remember seeing "cuts and scrapes on [defendant's] forehead" in the hospital after the accident. [Certification of Timothy Reilly, Esquire, Pa9].

(Opinion, Superior Court, Law Division, Burlington, at 9-15, 20-21 (Feb. 25, 2008) (emphasis in original.)

Having reviewed the record, ... we affirm substantially for the reasons stated in Judge Almeida's cogent written opinion. We add the following comments.

To prevail on a claim of ineffective assistance of counsel, defendant must show that her counsel's performance was deficient and that those deficiencies materially contributed to her conviction. See Strickland v. Washington, 466 U.S. 668, 67-88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); State v. Fritz, 105 N.J. 42, 58 (1987). Even viewing the facts in a light most favorable to defendant, she did not present a prima facie case of ineffective assistance of counsel and was not entitled to an evidentiary hearing. See State v. Preciose, 129 N.J. 451, 462-63 (1992).

(Opinion, Appellate Division at 5-6 (Oct. 7, 2009).)

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel is "the right to <u>effective</u> assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Strickland at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As a general matter, strategic

23

choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland. See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

The Strickland two-part standard applies to ineffective-assistance claims arising out of the guilty plea process. Hill v. Lockhart, 474 U.S. 52, 57-9 (1985). In the context of guilty pleas, the first element of the Strickland test remains "nothing more than a restatement of the standard of attorney competence." Hill, 474 U.S. at 58. The "prejudice" requirement, "on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59. Alternatively, a prisoner may establish prejudice by demonstrating that he likely would have received a lower sentence

by pleading guilty rather than proceeding to trial, <u>see</u> <u>U.S. v.</u> <u>Booth</u>, 432 F.3d 542, 546-47 (3d Cir. 2005).

Here, the state courts correctly identified and applied the governing Supreme Court case law.  The state court decisions are neither contrary to nor an unreasonable application of the governing Supreme Court case law, nor are they based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

C.  <u>The Sentence</u>

Petitioner contends that the imposition of a sentence greater than the presumptive sentence, based upon the trial judge's findings regarding aggravating factors, violated her Sixth Amendment right to trial by jury.  Petitioner raised this claim in her state petition for post-conviction relief.  The state courts rejected the claim.

> ... Point (a) of defendant's <u>pro se</u> petition alleges that the holding in <u>State v. Natale</u>, 184 N.J. 458, requires the Court to re-review the sentence imposed here.  This claim is not procedurally barred because it could not have been reasonably brought on direct appeal because <u>Natale</u> was not decided until August 2, 2005.  Defendant's direct appeal was decided by the Appellate Division on February 8, 2005 and certification was denied by the Supreme Court on May 3, 2005.  While this fact procedurally allows the claim to be brought under Rule 3:22-4, it is the same fact which is fatal to the defendant's claim.  <u>Natale</u> holding was given only "pipeline retroactivity."  <u>Ibid</u>. at 494.  Therefore, <u>Natale</u> holding applies only to defendants who have cases on direct appeal as of the date of the decision.  Consequently, without reaching the merits of defendant's <u>Natale</u> claim, this claim is denied.

(Opinion, Superior Court, Law Division, Burlington, at 23 (Feb. 25, 2008).)

>        Finally, defendant's direct appeals were concluded
> before <u>Natale</u> was decided.  As the Supreme Court
> indicated, <u>Natale</u> only has pipeline retroactivity.
> <u>Natale</u>, <u>supra</u>, 184 N.J. at 494.  Therefore, <u>Natale</u>'s
> sentencing principles cannot be invoked in defendant's
> PCR petition.

(Opinion, Appellate Division at 6 (Oct. 7, 2009).)

A federal court's ability to review state sentences is limited to challenges based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies."  <u>See</u> <u>Grecco v. O'Lone</u>, 661, F.Supp. 408, 415 (D.N.J. 1987) (citation omitted).  Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation.  <u>See</u> <u>Pringle v. Court of Common Pleas</u>, 744 F.2d 297, 300 (3d Cir. 1984).  <u>See also</u> 28 U.S.C. § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991); <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990).

Petitioner contends that the trial judge improperly sentenced her to terms greater than the presumptive term for his crimes of conviction, in violation of the rule announced in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), and <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).  As noted above, the state courts rejected this claim.

In Apprendi v. New Jersey, 530 U.S. at 471, 490, pursuant to the Fourteenth Amendment right to due process, coupled with the Sixth Amendment right to trial by jury, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court overturned a sentence imposed under Washington state's sentencing system, explaining that "the relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings."  542 U.S. at 302 (internal quotations omitted).  More specifically, "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  542 U.S. at 303 (emphasis in original) (citations omitted).  Most recently, in United States v. Booker, 543 U.S. 220 (2005), the Supreme Court applied the rule of Apprendi to the United States Sentencing Guidelines, finding the Guidelines unconstitutional, and rendering them merely advisory, rather than mandatory.

In State v. Natale, 184 N.J. 458 (N.J. 2005), the Supreme Court of New Jersey evaluated the constitutionality of the New Jersey sentencing scheme in light of the Apprendi line of cases.

27

> Our Code provisions make clear that, before any
> judicial factfinding, the maximum sentence that can be
> imposed based on a jury verdict or guilty plea is the
> presumptive term.  Accordingly, the "statutory maximum"
> for Blakely and Booker purposes is the presumptive
> sentence.

Natale, 184 N.J. at 484.  Because the Code's system allows for sentencing beyond the statutory maximum presumptive term, the Supreme Court of New Jersey found the state sentencing system unconstitutional and determined that the appropriate remedy would be to follow the lead of Booker and abolish the presumptive terms.  "Without presumptive terms, the 'statutory maximum' authorized by the jury verdict or the facts admitted by a defendant at his guilty plea is the top of the sentencing range for the crime charged, e.g., ten years for a second-degree offense."  Natale, 184 N.J. at 487 (citation omitted).  The Supreme Court of New Jersey held that the rule it announced in Natale was applicable retroactively only to cases in the direct appeal pipeline as of the date of that decision, August 2, 2005. Natale, 184 N.J. at 494.  Petitioner had already concluded his direct appeals by the date of the Natale decision; thus, the Natale decision did not entitle him to relief, as a matter of state law.

Similarly, the Court of Appeals for the Third Circuit generally has held that the rules announced in the Apprendi line of cases are not applicable retroactively to cases on federal collateral review.  See generally In re Olopade, 403 F.3d 159 (3d

28

Cir. 2005) (finding that the decision of the supreme Court in
Booker does not apply retroactively to cases on collateral
review); United States v. Swinton, 333 F.3d 481 (3d Cir.), cert.
denied, 540 U.S. 977 (2003) (holding that Apprendi does not apply
retroactively to cases on collateral review); In re Turner, 267
F.3d 225 (3d Cir. 2001) (holding that Apprendi does not apply
retroactively to cases on collateral review).  See also United
States v. Price, 400 F.3d 844, 849 (10th Cir.), cert. denied, 126
S.Ct. 731 (2005) (Blakely does not apply retroactively to cases
on collateral review).

Here, whether or not the sentence was imposed in violation
of the rules announced in the Apprendi/Natale line of cases,
Petitioner is not entitled to relief in this federal collateral
proceeding.

IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or
judge issues a certificate of appealability, an appeal may not be
taken from a final order in a proceeding under 28 U.S.C. § 2254.
A certificate of appealability may issue "only if the applicant
has made a substantial showing of the denial of a constitutional
right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this
standard by demonstrating that jurists of reason could disagree
with the district court's resolution of his constitutional claims
or that jurists could conclude the issues presented are adequate

29

to deserve encouragement to proceed further." <u>Miller-El v.</u>
<u>Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of
the denial of a constitutional right.  Jurists of reason would
not disagree with this Court's resolution of Petitioner's claims.
No certificate of appealability will issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition will be
denied.  An appropriate order follows.


At Camden, New Jersey                 /s/ Noel L. Hillman
                                      Noel L. Hillman
                                      United States District Judge

Dated: January 30, 2012